James E. SCHOENECKE, Respondent,

v.

Melroy RONNINGEN, Appellant.

No. 81–400.

Supreme Court of Minnesota.

Feb. 12, 1982.

Rehearing Denied April 16, 1982.

Grannis, Grannis, Campbell & Farrell, Patrick A. Farrell and Roger N. Knutson, So. St. Paul, for appellant.

O'Brien, Ehrick, Wolf, Deaner & Downing, Rochester, for respondent.

YETKA, Justice.

Appellant Melroy Ronningen appeals from an order of the Olmsted County District Court denying his motions for judgment notwithstanding the verdict or a new trial in this action for alienation of affections. We reverse and remand for a new trial unless respondent consents to a remittitur and entry of judgment for $50,000.

Nancy Ronningen met James Schoenecke in the summer of 1968 when she was 17 and he was 35. At that time, he was married with three children. Within 2 or 3 months, their relationship became sexual and in 1970 Schoenecke obtained a divorce and married Nancy.

At the time of the marriage, Schoenecke was employed as a night bartender at Michael's in Rochester. He started there in 1966 and still held that position at the time of trial. Nancy was employed for the first year and a half of the marriage at a figure salon in Rochester. Shortly before their marriage, Nancy and Schoenecke moved into a house in Oronoco. They both worked hard to refurbish the house indoors and out.

In 1974, first one, and then the other two, of Schoenecke's children moved in with their father and Nancy. Nancy and the children got along well and the family unit was close—they gardened, raised animals, rode horseback, and engaged in winter sports. Nancy was an excellent housekeeper.

According to Schoenecke, he and Nancy shared a close physical relationship. Although he admitted some arguments—mostly about money—he felt that the marriage relationship was stable. Nancy agreed that she was close to Schoenecke's children, but stated that the relationship with Schoenecke deteriorated when he failed to keep his promise to avoid excessive drinking. His drinking led to arguments and physical abuse. These incidents were corroborated by two of Schoenecke's children, although he denied having an alcohol problem.

During their marriage, Nancy and Schoenecke frequently went out for dinner with Melroy Ronningen, a farmer and cattle buyer who had been Schoenecke's best friend since 1966. Schoenecke testified that he first became suspicious of Ronningen's intentions towards his wife in late 1974 when he left work early and found Nancy washing dishes dressed in a transparent robe and panties and Ronningen watching TV and drinking whiskey. He told Ronningen to leave. Ronningen and Nancy deny that any confrontation occurred and insist that the situation was innocent. Schoenecke recalled that, after this incident, Nancy began to show a preference for riding near Ronningen on horseback trail rides and while snowmobiling. A local police officer testified that, in the fall of 1974, Ronningen's car was at Schoenecke's in the evening between two and four times a week. On one occasion, the officer observed Nancy and Ronningen through the window. Both were running around nude from the waist up. Schoenecke's son testified that he observed Nancy, Ronningen, and others playing strip poker. Nancy was wearing panties and Ronningen was naked.

In January 1975, Nancy left the Schoenecke home. Schoenecke stated that she, at that time, confessed that she had been having an affair with Ronningen for over a year. Nancy denied that she had had sexual relations with Ronningen prior to her separation from Schoenecke. After she left Schoenecke, Nancy stayed briefly with her mother and then was taken by Ronningen to visit a girl friend in Michigan. She returned to Ronningen's house and from there traveled with him to Florida and Puerto Rico. She continued to reside at Ronningen's and Ronningen gave her money and paid her attorneys' fees when Schoenecke sued for dissolution of the marriage. Nancy and Schoenecke were divorced in May 1976 pursuant to a stipulated property settlement of $4,000. Nancy married Ronningen in August 1978.

Schoenecke commenced this suit on March 1, 1976. The complaint alleged alienation of affections and criminal conversation. Each count prayed for $50,000 compensatory damages and $100,000 punitive damages. At the close of the evidence, the trial court dismissed the claim of criminal conversation. In his final argument, Schoenecke's counsel stated that Schoenecke's out-of-pocket damages were $1,000 for attorneys' fees for the divorce and $4,000 for the property settlement. He noted that deprivation of society, affection, conjugal fellowship, and assistance are intangible and difficult to value, but suggested a figure of $5 per day for Schoenecke's 25-year life expectancy, i.e., $45,625. He also requested punitive damages and suggested using 1/10th of Ronningen's assets as a measure. He stated that Ronningen owned a farm worth $350,000, a ranch in Florida valued at $575,000, and was owed $200,000 on a contract for deed. Ronningen's attorney objected on the ground that the testimony was that Ronningen owed a substantial amount—$450,000—on the Florida ranch. The trial court instructed the jury to rely on its own recollection of the evidence as to Ronningen's net worth.

After deliberating for approximately 3 hours, the jury returned for additional instructions on punitive damages. Their concern was that, although punitive damages are intended to be a punishment to the defendant and a deterrent to others, repeal by the legislature of the cause of action for alienation of affections appeared to nullify the role of deterrence. The judge responded: "Well, I would just have to leave that to your judgment and—to determine whether you believe justice requires it then. And that's at your option. Okay?" The jury then retired for an additional 10 minutes and returned a verdict of $122,000 general damages, $0 punitive damages. Ronningen moved for judgment notwithstanding the verdict or a new trial. The motions were denied and this appeal followed.

■ The sole issue on appeal is whether the trial court abused its discretion by refusing to grant a new trial on the ground that the verdict was excessive. The excessiveness of a verdict is, of course, generally a matter for the trial court, and we should interfere only in those rare instances where there is plain injustice or a monstrous or shocking result. *Kennedy v. Caudell*, 277 Minn. 35, 39, 151 N.W.2d 407, 410 (1967). In cases of this sort, however, courts and commentators have long noted that "heart balm" suits are particularly susceptible to inflated awards because the jury is permitted to compensate for wounded feelings in circumstances where emotional sympathies and moral indignation are likely to be engaged. Feinsinger, *Current Legislation Affecting Breach of Promise to Marry, Alienation of Affections, and Related Actions*, 10 Wis.L.Rev. 417 (1935). As one commentator has noted, affections are rarely alienated when the marriage is solidly based and many factors influence a loss of affection. H. Clark, *Law of Domestic Relations* § 10.2 (1968). It is difficult to escape the conclusion of the Iowa Supreme Court that alienation of affection suits demean the parties and the courts. *Fundermann v. Mickelson*, 304 N.W.2d 790 (Iowa 1981). It is not surprising, then, that the Minnesota Legislature abolished alienation of affection suits in 1978. In prior years, we have approved reduced verdicts in this area of tort law in appropriate instances. *Drobnich v. Bach*,

159 Minn. 258, 198 N.W. 669 (1924); *Spangenberg v. Christian*, 151 Minn. 356, 186 N.W. 700 (1922); *Bathke v. Krassin*, 82 Minn. 226, 84 N.W. 796 (1901); *Bathke v. Krassin*, 78 Minn. 272, 80 N.W. 950 (1899).

It appears defendant Ronningen invited the size of the verdict as he may have been untruthful in his testimony. His demeanor, as the trial court commented, "was one of nonchalance if not unconcern and perhaps almost arrogance." This behavior tends to establish defendant's liability and is relevant on punitive damages, but it should not be (although it evidently was) a factor in measuring plaintiff's compensatory damages.

In light of the aforesaid facts, this court must decide what should be done with the damage award. To recount the evidence here is unnecessary and little will be gained by remanding for a new trial on damages. While the *ad damnum* clause in plaintiff's complaint does not preclude a higher award, it would seem justice is accomplished in this case by giving plaintiff exactly what he sued for—$50,000. We therefore reverse and remand the case to the district court with instructions that a new trial be ordered unless respondent will consent to a remittitur and entry of judgment for $50,000.

KELLEY, J., took no part in the consideration or decision of this case.